Filed 7/28/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KELSEY CARPENTER,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>    Respondent;<br><br>THE PEOPLE,<br><br>    Real Party in Interest. | D081640<br><br><br>(San Diego County<br>Super. Ct. No. SCN422556) |

ORIGINAL PROCEEDING in mandate challenging an order of the Superior Court of San Diego County, Michael D. Washington, Judge.  Petition denied.

Brian J. White; Law Office of Amber Fayerberg and Amber Fayerberg for Petitioner.

No appearance for Respondent.

Summer Stephan, District Attorney, Linh Lam, Valerie Ryan, and Jennifer Kaplan, Deputy District Attorneys, for Real Party in Interest.

Effective January 1, 2023, the Legislature enacted a new law providing immunity from criminal or civil liability for a person's acts or omissions with respect to their pregnancy or pregnancy outcome, including "perinatal death due to causes that occurred in utero." (Health & Saf. Code, § 123467, subd. (a).)[1] As part of the same bill, the Legislature declared that an individual's fundamental right of privacy regarding personal reproductive decisions includes "the right to make and effectuate decisions about all matters relating to pregnancy, including prenatal care [and] childbirth[.]" (§ 123462.) This case requires us to explore the dividing line between immune conduct relating to a person's pregnancy or reproductive decisions and non-immune post-birth conduct allegedly causing the death of an infant who was born alive.

The relevant facts are undeniably tragic. Kelsey Carpenter gave birth to a baby girl at home, alone, after deciding that she would not risk having her child removed from her custody as had happened with her two older children when they tested positive for drugs after being delivered at the hospital. She again used drugs during her pregnancy. After Carpenter's daughter was born, the baby struggled to breathe, and Carpenter attempted to provide her with CPR. Carpenter also cut the baby's umbilical cord but did not clamp it, and the umbilical stump continued to bleed. Carpenter bathed, diapered, clothed, and attempted to breastfeed the baby before seemingly passing out. When she woke up, her newborn daughter was dead.

Before the new immunity provision went into effect, the People charged Carpenter with implied malice murder and felony child endangerment, contending that Carpenter intentionally chose an unattended at-home delivery, despite being warned of the dangers, in an effort to evade child

---

[1] Undesignated statutory references are to the Health and Safety Code.

welfare services and at the risk of her daughter's life. According to the People, Carpenter's acts and omissions, including her failure to seek medical assistance after realizing her baby was in distress, caused the baby to bleed to death. The People presented evidence in support of the charges against Carpenter at a preliminary hearing, at the end of which the magistrate found the evidence sufficient to hold Carpenter to answer on the charges. Carpenter then moved to dismiss the information.

By petition for writ of mandate, Carpenter now challenges the superior court's order denying her motion to set aside the information for lack of probable cause under Penal Code section 995. She contends that she is immune from prosecution based on the new law, which went into effect after the preliminary hearing, but before the superior court ruled on her section 995 motion. Carpenter argues that the People's prosecution of her is unlawful because it is based on her actions and omissions with respect to her pregnancy outcome and violates her right to choose to have an unattended home birth.

We agree that Carpenter cannot be prosecuted for her decision to have an unattended home birth or any effect that her alleged drug use or lack of prenatal care during pregnancy may have had on her baby. We conclude, however, that the law does not preclude the People's prosecution of Carpenter for her acts and omissions after her daughter was born alive. Given the minimal showing the prosecution is required to make at a preliminary hearing, and after conducting an independent review of the record, we also conclude that there was sufficient cause—albeit by the thinnest of margins— to bind over Carpenter on the implied malice murder and felony child endangerment charges. We therefore deny the petition.

3

FACTUAL AND PROCEDURAL BACKGROUND

In November 2020, Carpenter went into labor at her apartment approximately two weeks before her due date. She gave birth at home to a baby girl named Kiera who died within hours. In March 2021, the People charged Carpenter with one count of murder (Pen. Code, § 187, subd. (a)) and one count of felony child endangerment resulting in death (Pen. Code, § 273a, subd. (a)). In September 2022, a preliminary hearing was held before a magistrate judge. The People presented evidence consisting of testimony from law enforcement officers, Carpenter's statements, text messages sent to and from Carpenter, and testimony from the medical examiner who performed Kiera's autopsy.

A. *Events Leading Up to the Birth*

1. *Carpenter's Conversations and Text Messages with Her Mother*

Detective Ryan Malone, who was one of the officers assigned to investigate Kiera's death, testified at the preliminary hearing that he interviewed Carpenter's mother, Shande, to get more information about Carpenter. Shande stated that her daughter suffered from anxiety, depression, and oppositional defiant disorder, occasionally drank alcohol, and used to be on methadone. She was aware that Carpenter was pregnant but had not spoken to her much in the two months leading up to Kiera's birth due to an argument they had. The last time Shande spoke on the phone to Carpenter, about a week before she gave birth, Carpenter mentioned to her mother that she was "red-flagged" by Child Welfare Services (CWS). Shande told Detective Malone that Carpenter had two other children who were removed from her custody by CWS after testing positive for drugs at the time of birth. Carpenter had visitations with her sons, but they were not under her direct care. One of Carpenter's sons was under Shande's care.

4

Carpenter told Shande that when it came to her most recent pregnancy, she wanted to have her babies[2] at home with the help of a midwife. Shande told Detective Malone that Carpenter was excited to have the babies and wanted to keep them.

During the hearing, Detective Malone read several text messages between Carpenter and Shande into the record. The pair exchanged texts the day before Carpenter went into labor, with Carpenter expressing frustration with her mother for not allowing her to see her son. Shande asked Carpenter when she was due and then said, "It's not safe to have twins at home, Kelsey, especially bc they will be born addicted to methadone which you're on for most of the pregnancy and whatever you're on now, not to mention alcohol, et cetera. WAY TOO DANGEROUS FOR THEM AND YOU." Carpenter did not respond until the following day at 10:42 p.m. when she told her mother she was in labor. She also left her mother a voicemail around the same time, telling her she was in labor, but Shande was sleeping and did not respond.

2. *Carpenter's Other Text Messages*

Before and during labor, Carpenter also sent a number of text messages to various other people discussing her labor and decision not to go to a hospital to give birth. These texts provide a general timeline of the events leading up to Kiera's birth.

The morning of November 14, 2020, Carpenter texted a contact listed in her phone as "Ryan CLINIC" that she was having contractions, stating that they were "coming every few minutes so [I'm ]gonna chug this wine and take klonopins and push my children . . . . I AM NOT LOSING MY KIDS AND THATS WHAT WILL HAPPEN IF I GO TO THE HOSPITAL. . . ." At 3:45 p.m., she texted Ryan again, saying she was in active labor. Ryan asked

---

[2]    Carpenter mistakenly believed she was pregnant with twins.

5

whether Carpenter was in the hospital, and she responded: "Fuck no!!!!!!! I'm DOING IT HERE IM NOT LOSING MY[]FUCKING KIDS!!"

Carpenter seemed to blame Ryan for not helping her delay her early labor, texting him at 4:05 p.m.: "What don't u get!!!!!!! Had u given me something THIS MORNING I WOULD HAVE LASTED THE DAY [¶] . . . [¶] You think I don't know you had s[hi]t that could have subsided my labor and you DID NOTHING [¶] . . . [¶] Bye im having my babies tonight probably in the middle of the night im 3 middle fingers . . . ." Shortly after 6:00 p.m., she texted Ryan again: "Your bitch ass could have stopped it with fetalnyl [*sic*] I will hate you for the rest of my life got[]it ? Because I wasn't dilated yesterday and now by tomorrow afternoon ill have either dead or alive babies im NOT LOSI[NG] THEM.TO YOUR SALT SHIT AND WINE COCKTAIL [¶] . . . [¶] And get the fuck away from.me!!!!!!!! If you tell ANYONE IM HAVING THEM AT HOME BY MYSELF YOU CAN JUMP OFF THE BRIDGE WITH JEFF FOR ALL I CARE!!!!"

At 6:22 p.m., Carpenter texted someone named Shawn M. that she had been in labor since 4:00 a.m. that morning and would not be going to the hospital. She said she was "hurting really badly" and told him not to tell anyone that she was giving birth at her apartment "where the kids were safe from the system."

At 6:37 p.m., Carpenter texted her friend Eddie E.: "Im in labor. [¶] No hospitals are happening f[o]r me tonig[h]t. I had my bloody show i had my mucus membrane break and I have contractions less than 5 minutes apart[.] [¶] . . . [¶] I need some clean towels and sheets its a big one on the list[]. [¶] For home births[.] [¶] Please do you have anything I am contacting a midwife I met but I need your help[.] [¶] Im scared !!!!!!!!!!!!!!! I have stuff in my system from yesterday, and I AM NOT LOSING MY

6

KIDS[.]" Eddie responded: "I have no wheels right now or money[.] . . . Let me see what I can do[.]"

At 6:53 p.m., Carpenter texted another contact in her phone, Ken K., asking if his wife was a midwife and seeking help with the birth. She told Ken she had been studying for months and asked him if he could provide clean towels and sheets. When Detective Malone later spoke with Ken, he confirmed that Carpenter had texted him asking if his wife could help her with her labor and delivery. Ken told Carpenter he could not assist her but that he would keep their conversation confidential, as she asked him not to tell anyone what she was doing.

At 7:33 p.m., Carpenter texted Eddie again: "You have no medical experience just forget it what I need fro[m] you is towels and sheets can your brother bring them over[?] [¶] I'm about to get in my bath and ride out some of these contractions and I need new sheets put on my bed for the birthing itself to take them out clean them up and I have to prepare for cpr I have a ton to do[.] [¶] It will be another 10 hours but 5 of that is pushing and making sure they are ok[.] I can't get through a contraction without having to stop talking so they are severe enough to where my next stage is water breaking or someone has to d[o] it for []me . . . you don't trust any midwife or nurses u.k[n]ow??? [¶] I need the set up ready i have the health everything for their breathing my CPR cert all ready but its getting harder to walk around I need help[.]" Eddie replied that he would ask his brother.

At 8:48 p.m., Ryan texted Carpenter again: "I would appreciate it if you would come back down to reality and realize that you can't have your kids at home safely you haven't even been to a prenatal care . . . you don't even know when your kids are supposed to be born you need help dude . . . ." At 10:42 p.m. Carpenter texted Ryan: "Im.in labor [i]n.my bathtub with

7

twins and its the most excruciating pain in the entire world[.]" Ryan responded: "Dude is anyone there[?] [¶] I'm being dead serious you have to be careful with this I know you're fear [*sic*] but this is no joke what if something goes wrong[?]" Carpenter replied: "I NEED AN OPIA[TE]. THIS IS THE MOST PAIN IVE EVER EVER BEEN IN IN MY LIFE . . . [¶] Please!!!!!! Otherwise i have to go the hospital their heart beats are ok but im contracting every 30 seconds [¶] . . . [¶] My mom won't answer !!!!! And the hospital now [*sic*] I've drank Ive smoked cigarettes I've done whatever to try to stop this process [¶] . . . make it easier PLEASE GET FENTANYL THEY WONT TEST FOR IT[.]"

At 11:14 p.m., Carpenter texted Ryan again: "Eddie's brother[] just walked out an[d ]left . . . [m]e in the bathtub my contrac[ti]ons are every 15 secs[.] [¶] Im crying I fe[e]l I need to push[.] [¶] I need somet[hing] for the pain[.] [¶] Omg im freaking[.]"

Ryan did not respond until 1:09 a.m., when he texted: "Dude I'm going to call an ambulance[.] [¶] Please help me help you I don't know what else to do[.] [¶] I'm going to give it 10 minutes then I'm going to have to call. I don't know what else to do and you could get seriously hurt or the babies[.] [¶] Everything will get worked out I know you're scared and don't want to loose [*sic*] them but if you don't get to the hospital [it] could end really bad[.]"

3. *Statements from Carpenter's Contacts*

Eddie told Detective Malone that Carpenter planned to give birth at home to avoid the hospital because of her history with CWS with her previous children. Eddie encouraged her to go to the hospital multiple times.

Detective Malone also testified that he spoke with Eddie's brother, Iran A., who told the detective that he received texts from Carpenter at around 8:19 p.m. the night of November 14 asking him to bring rubber gloves

8

and masks to her apartment, which he did.  Iran had not met Carpenter in person at that point, but he had previously agreed to give her a ride to the hospital when she went into labor.  Iran arrived at Carpenter's apartment at around 10 p.m.  At Carpenter's request, he checked her cervix, retrieved "a bottle of wine and some pills" for her, and drew her a bath.  According to Iran, Carpenter then insisted that Iran leave her apartment because he did not seem comfortable with the situation.  When Detective Malone asked Iran why he did not call 911, Iran stated that Carpenter "commanded him" not to.

B.  *Events After the Birth*

The parties agree that Carpenter gave birth to Kiera sometime after 11:14 p.m. on November 14 and before 6:29 a.m. on November 15.

1.  *Carpenter's Texts*

At 6:29 a.m. on November 15, Carpenter used her phone for the first time since the prior night, texting Ryan:  "My daughter died[.]"  [¶]  "I woke up next to a dead baby[.]  [¶]  I've been giving her mouth to mouth its not working[.]  [¶]  Im going to kill.myself today.  [¶]  Bye[.]"

2.  *Carpenter's Statements to First Responders*

Carpenter called 911 at 6:59 a.m. on November 15.  She was crying and told the dispatcher that she had just given birth and the baby was not breathing.  She said that she had tried to give the baby CPR but it was not working.  The dispatcher asked Carpenter whether she had planned on having a home birth, and she said "no."

Paramedics arrived on the scene at 7:05 a.m.  Paramedic Captain Rocky Rehberg was the first person to enter Carpenter's apartment after her call to 911.  Detective Malone testified that Captain Rehberg said his "first thought was that the baby was dead -- was blue around the lips, had no pulse, was limp, and he thought that was odd because, according to their

9

knowledge, the baby -- the mom had just given birth prior to the arrival and the baby seemed like he had been dead -- she had been dead longer than that." Captain Rehberg told Detective Malone that he remembered noticing that the umbilical cord had not been clamped and he thought that the baby had died from blood loss.

Officer Ann O'Neill spoke with Carpenter at her apartment, and Carpenter said she had given birth about two hours before the officers arrived. She told Officer O'Neill that after she gave birth, "the baby was not breathing, [and] possibly had a nasal passage blockage." Carpenter said she had not been able to call 911 sooner because her cell phone was dead. Officer O'Neill testified that the officers and paramedics urged Carpenter to go to the hospital, but she initially refused because she said she had an issue at the hospital with the birth of her prior child, "which is why she wanted to have the baby at home."

3. *Observations of Law Enforcement and Medical Staff at the Hospital*

Oceanside Police Officer Tyrone Dunn testified that he was on duty the morning of November 15 when he received a "possible CPR call" and was directed to Tri-City Medical Center, where Kiera had been transported by ambulance. Upon entering the Emergency Department, Officer Dunn ran into Captain Rehberg, who stated that the baby had no pulse when he arrived at the scene. Officer Dunn then entered the room where one of the emergency room (ER) physicians, Dr. Ma, was talking and giving directions to nurses attending to Kiera. Dr. Ma asked why the baby had low blood pressure, and when he inspected her diaper, he found a pool of blood in the diaper, leading him to suspect the baby was bleeding.

Medical staff then directed Officer Dunn to bags of clothing and a placenta that the paramedics had taken to the hospital with them. Officer

10

Dunn described seeing a piece of Scotch tape on Kiera's umbilical cord stump as she was laying on the table in the ER and medical staff were attempting to save her life. Dr. Ma removed the piece of tape from the baby's body. The photograph of the piece of tape with blood on it shown at the preliminary hearing also depicted a bloody piece of gauze, but Officer Dunn did not recall seeing any gauze by the umbilical cord when he was in the room.

4. *Carpenter's Post-Arrest Statements to Law Enforcement Officers*

After she was arrested, Carpenter agreed to speak to law enforcement officers about what happened during and after Kiera's birth. Carpenter told Detective Malone and his partner that while in labor, she felt like she needed to have a bowel movement, so she went to the bathroom. While she was over the toilet, she pushed multiple times and eventually gave birth to a crying baby girl. Carpenter said she cut the umbilical cord using medical scissors, put some cloth over the end of the umbilical cord, and tried to nurse the baby. At that point, the baby seemed like she was having trouble breathing and began turning blue, so Carpenter started giving the baby CPR, but it was not working.

Carpenter told the officers she initially could not call 911 because her phone was dead, and she could not find her phone charger. She eventually found her phone charger, charged her phone, and called 911. When asked why she could not go to a neighbor's apartment to ask for help, she said she was in pain and could barely walk.

Carpenter also told the officers that she was working with a midwife named Shannon S. and that she never planned on having the baby at home but instead had always planned on having the baby at the hospital. She stated that she wanted to work with the midwife to ask her about "HypnoBirthing" because being at the hospital was very stressful. Carpenter

11

said she made an agreement with Tri-City Medical Center that she would give birth there. She stated that she had not been trying to avoid CWS.

5. *Carpenter's Statements to Others*

Detective Malone testified that contrary to what Carpenter had said, Shannon told officers that although she was a registered nurse in Georgia, Carpenter never talked to her about acting as a midwife or providing any medical assistance for her birth. Shannon met Carpenter at their shared doctor's office several months before Carpenter gave birth. She exchanged phone numbers with Carpenter with the intent of being friends with her after she had her baby. Shannon had no knowledge of Carpenter's plan to give birth at home. Shannon told Detective Malone she had received a text from Carpenter about being in labor, but she had recently lost her phone and did not see the text until the following day.

When Shannon saw Carpenter at their shared doctor's office a couple of days after Carpenter was released from jail, Carpenter relayed what had happened during her labor and delivery. According to Shannon, Carpenter said she gave birth in the bathroom, where she started bleeding profusely, and then the baby came quickly. Carpenter told Shannon she had secured the baby's umbilical cord but did not say how. She also told Shannon that after Kiera was born, she had trouble breathing. Shannon told Carpenter that was probably because the baby needed deep suction, which the hospital could have performed. Carpenter further told Shannon that after she woke up, Kiera was dead on her chest, and her body was blue. This led Shannon to believe that Carpenter must have passed out at some point after giving birth. Finally, Shannon told Detective Malone that Carpenter told her that she had previously read online about "the percentages of the bad things happening

12

during home births . . . but she never thought it would really happen to her in real life."

    6. *Items Found at Carpenter's Apartment*

At the hearing, Detective Malone described what was found after officers executed a search warrant and searched Carpenter's apartment. The officers found the medical scissors and plastic sheeting Carpenter had mentioned during her interview, as well as a bloodstained binder from Tri-City Medical Center with information on how to take care of a newborn, including paperwork titled "Neonatal Release Care Guide." Also at the apartment was a book titled "Parenting, Substance Misuse, and Child Welfare," which had some pages that had been tabbed or highlighted, some insurance paperwork for LB Medical Group LLC for midwife services, and a printout from a website titled "Emergency Labor. What To Do If You Have To Give Birth Alone," which was a "step-by-step" guide. Detective Malone testified that the printout stated that "step 2 is to call 911" and he "recall[ed] somewhere around step 5 or 6 it tells you what to do with the umbilical cord. And it says to not cut the umbilical cord because of the blood and other life-saving things that are in there to help keep the baby alive while you wait for EMS to arrive." Other items found at the apartment included a contraction timer, crib, a changing table, baby toys, gauze dressing pads, a fetal Doppler monitor, an opened packet of antibiotic ointment, a plastic or rubber bulb suction, a baby bottle, and other baby care items.

Detective Malone also testified that officers found drug paraphernalia in Carpenter's apartment, including a plastic ice cream scoop with crystallized methamphetamine in it and a crushed aluminum can containing black tar heroin residue. Carpenter told officers that the drug paraphernalia belonged to someone named Ryan K. who had recently been at her

13

apartment. She said that she had been receiving daily treatment for methadone, but that was the extent of her drug use.

C. *Autopsy and Cause of Death*

Medical examiner Dr. Anna Park determined the cause of death to be "perinatal death associated with methamphetamine and buprenorphine exposure and unattended delivery." Dr. Park concluded in her medical report and at the hearing that the manner of death was "accidental," but she agreed that other medical examiners could reasonably have concluded the cause of death to be "undetermined." When questioned at the hearing what she meant by "unattended delivery," Dr. Park stated that the phrase was "meant to describe the fact that improper procedure was performed in order -- at the time of delivery, which included not clamping the umbilical cord upon cutting the cord. In addition, no sterile procedure was used to cut the cord, and there was no medical personnel to -- present to monitor the fetus upon delivery. Typically, you have fetal monitoring during the time of delivery too. And, in essence, also to describe the hemorrhaging at the umbilical stump which was apparent at the time of the autopsy." She also testified to seeing dried blood around the umbilical stump and the baby's abdomen, that Kiera had been "wrapped in a hospital blanket" that was "soaked" in blood, and that her diaper "was also covered in blood," although the amount of blood was "unquantifiable."

D. *Magistrate's Findings*

At the end of the hearing, the magistrate judge issued her findings, stating that she found sufficient evidence under the probable cause standard to bind Carpenter over on the implied malice murder charge: "In terms of the implied malice murder, the subjective awareness, and the conscious disregard

14

for human life, I do find that there is sufficient evidence for a preliminary hearing. I do find that there is sufficient evidence of that."

The magistrate focused on Carpenter's actions before Kiera's birth as she explained her findings: "She had -- what's interesting is that she's taken a lot of steps to prepare for having this baby at home. And her goal is not to have CWS involved because she's aware of what's going to happen if she does have this at the hospital because of what had happened to her other two children. So her desire to not get CWS involved really overcame her duty to make sure that this baby was delivered safely. [¶] Not that she didn't make efforts to have a safe delivery in a sense: The article that she had at her house, her inquiry as to a nurse, her inquiry of a midwife, which indicates to this Court that she was aware that she shouldn't be having this baby by herself at home without any kind of medical training, and that it was not safe to do so. So I do find that there is subjective awareness there."

The magistrate continued: "But even if she had this baby unexpectedly, wasn't expecting to go into labor early, she had multiple opportunities to go to the hospital, and she had multiple people telling her by text message that she needed to go to the hospital and get help and not deliver this baby alone. But, again, she chose not to do that because of her desire not to have CWS involved. And so when I listen to that evidence and consider that evidence, I do find that there is enough for a preliminary hearing bind-over, that there is implied malice."

Moving on to the element of causation and her conclusion, the magistrate stated: "As to the expert testimony that I believe that you will ultimately get out, Mr. White, from your experts -- and I had the doctor here testify. And her analysis and cause of death was different than, I believe, what your expert is going to testify to. She did agree to some points, but

15

ultimately, her cause of death did not change even with the report that you had asked her about. And so for all of those reasons, and based on the evidence that this Court heard, I do believe that there's probable cause to believe that the following offenses in Counts 1, 2, and the allegation attached to Count 2 have been committed and the defendant is guilty thereof. So I do bind this case over to the Superior Court on both charges and the allegation in Count 2."

At the end of the hearing, the complaint was deemed to be an information, Carpenter was arraigned, and she entered a plea of not guilty to both counts.

E. *Penal Code Section 995 Motion to Dismiss*

In January 2023, Carpenter filed a motion to dismiss the information pursuant to Penal Code section 995 (section 995 motion). Carpenter argued that the newly enacted Assembly Bill No. 2223, which added and amended certain sections of the Health and Safety Code, immunizes her from prosecution, and that the People failed to present sufficient cause to bind the case over for trial.

The trial court heard argument and denied the motion, finding that the magistrate could properly infer that the evidence of Carpenter's post-birth conduct was sufficient to bind her over on the implied malice murder charge. The trial court stated: "The court can and [the magistrate] can infer from the conduct of the defendant in doing those things and not calling 9-1-1, she failed to act in her daughter's best interest. She failed to get her daughter the medical help that she should have known that her daughter needed because she should have understood that she didn't have the medical training necessary to deliver her own child."

16

F. *Writ Proceeding*

After Carpenter filed the present petition for a writ of prohibition, we issued an order directing the superior court to show cause why the relief sought in the petition should not be granted and stayed the criminal proceedings against Carpenter in trial court. The People filed a return, and Carpenter filed a reply.

DISCUSSION

I

"When we review a section 995 motion, we 'disregard[] the ruling of the superior court and directly review[] the determination of the magistrate.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654 (*San Nicolas*).) The magistrate's job at the preliminary hearing is "to determine whether there is 'sufficient cause' to believe defendant guilty of the charged offense." (*People v. Abelino* (2021) 62 Cal.App.5th 563, 573 (*Abelino*); see also Pen. Code, § 872.) "Sufficient cause" in this context means " 'reasonable and probable cause,' "—in other words, facts that would lead a person "of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667.) It is a level of proof below preponderance of the evidence. (*People v. Superior Court of San Diego County* (2021) 73 Cal.App.5th 485, 496 (*Valenzuela*).)

When a defendant files a section 995 motion, the court must set aside the information if the defendant has been committed without reasonable or probable cause. (Pen. Code, § 995, subd. (a)(2)(B).) To establish probable cause sufficient to withstand the motion, " 'the People must make some showing as to the existence of each element of the charged offense.' " (*People v. Scully* (2021) 11 Cal.5th 542, 582.) Evidence sufficient to justify a prosecution need not be sufficient to support a conviction. (*Ibid*.) Indeed, it

17

is well settled that, when it comes to the required showing for probable cause, the bar is " 'exceedingly low.' " (*Abelino*, *supra*, 62 Cal.App.5th at p. 573.)

In reviewing the section 995 motion, we "conduct an independent review of the evidence, but will not substitute our judgment for that of the magistrate as to the credibility or weight of the evidence." (*San Nicolas*, *supra*, 34 Cal.4th at p. 654.) Absent express findings, however, we "cannot assume [the magistrate] has resolved factual disputes or passed upon the credibility of witnesses." (*People v. Slaughter* (1984) 35 Cal.3d 629, 638 (*Slaughter*).)

Carpenter argues that the trial court improperly substituted itself as factfinder in reviewing the magistrate's ruling, and she urges this court not to "reweigh the facts." But the magistrate here did not resolve any factual disputes or assess the credibility of the witnesses. Rather, the magistrate merely accepted the prosecution's evidence and determined it was sufficient to support the charges against Carpenter, stating: "In terms of the implied malice murder, the subjective awareness, and the conscious disregard for human life, I do find that there is sufficient evidence for a preliminary hearing. . . . [B]ased on the evidence that this Court heard, I do believe that there's probable cause to believe that the following offenses in Counts 1, 2, and the allegation attached to Count 2 have been committed and the defendant is guilty thereof." We find that this is a legal conclusion. (See *Slaughter*, *supra*, 35 Cal.3d at p. 638; *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 546 (*Zemek*) [where "the prosecution witnesses' testimony 'was not inherently improbable, [they were] not significantly impeached, and the [magistrate] made no findings as to [their] demeanor,' [the court] must conclude that the magistrate's remarks are legal conclusions"].)

18

Because the magistrate made a legal conclusion rather than factual findings, we review the record independently to determine whether the evidence presented at the preliminary hearing constituted sufficient cause to sustain the charges in the information. (*Zemek*, *supra*, 44 Cal.App.5th at p. 546; *Valenzuela*, *supra*, 73 Cal.App.5th at p. 499.) And where, as here, a challenge to the sufficiency of the evidence is based on the interpretation of a statute, our interpretation of the statute is de novo as well. (*People v. Gallardo* (2015) 239 Cal.App.4th 1333, 1340.) We will not set aside the information " 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " (*San Nicolas*, *supra*, 34 Cal.4th at p. 654.)

II

We first analyze Carpenter's contention that the People's prosecution of her in this case is prohibited because the evidence consists entirely of conduct protected by sections 123462 and 123467. To do so, we must interpret the statutes to determine whether and how they apply here. Our fundamental task in interpreting a statute is to ascertain the Legislature's intent so as to effectuate its purpose. (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 487.) In determining that intent, we "look first to the words of the statute, which are the most reliable indications of the Legislature's intent." (*Ibid.*) We do not construe those words in a vacuum; we consider the provisions at issue "in the context of the statutory framework as a whole." (*Ibid.*) " 'If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.' " (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 83.)

19

A. *Assembly Bill No. 2223*

The day after Carpenter's preliminary hearing, Governor Newsom signed several bills relating to reproductive health care access and privacy into law. One of these was Assembly Bill No. 2223 (2021–2022 Reg. Sess.), which went into effect on January 1, 2023 (Assembly Bill 2223). It made several changes to the Reproductive Privacy Act, including amending section 123462 and adding section 123467 to the Health and Safety Code. Substantively, these changes included: prohibiting a person from being subject to civil or criminal liability based on their actions or omissions with respect to their pregnancy or actual, potential, or alleged pregnancy outcome, or based solely on their actions to assist a pregnant person exercising their reproductive rights; clarifying that an abortion is not unauthorized if performed by the pregnant person; authorizing a party whose rights are protected by the Reproductive Privacy Act to bring a civil action against an offending state actor when those rights are interfered with; and authorizing a person aggrieved by a violation of the Reproductive Privacy Act to bring a civil action pursuant to the Tom Bane Civil Rights Act. Assembly Bill 2223 also amended the Government Code relating to coroners' handling of fetal deaths, and prohibited the use of a coroner's statements on the certificate of fetal death to establish, bring, or support a criminal prosecution or civil cause of damages against a person immune from liability relating to their pregnancy or actual, potential, or alleged pregnancy outcome as set forth in the Reproductive Privacy Act.

B. *Statutory Language*

We turn first to the language of the relevant portions of sections 123462 and 123467. Section 123462 sets forth the Legislative findings and declarations with respect to the Reproductive Privacy Act, which was first

enacted in 2002 and originally provided, in relevant part: "The Legislature finds and declares that every individual possesses a fundamental right of privacy with respect to personal reproductive decisions." (§ 123462, Stats. 2002, ch. 385 (Sen. Bill 1301), § 8.) Assembly Bill 2223 amended this provision to add language defining "personal reproductive decisions" as entailing "the right to make and effectuate decisions about all matters relating to pregnancy, *including prenatal care*, *childbirth*, postpartum care, contraception, sterilization, abortion care, miscarriage management, and infertility care." (§ 123462, italics added.) "Pregnancy" is defined in section 123464, subdivision (b), as "the human reproductive process, beginning with the implantation of an embryo."

Assembly Bill 2223 also added Section 123467 as follows: "Notwithstanding any other law, a person shall not be subject to civil or criminal liability or penalty, or otherwise deprived of their rights under this article, based on their actions or omissions with respect to their pregnancy or actual, potential, or alleged pregnancy outcome, including miscarriage, stillbirth, or abortion, *or perinatal death due to causes that occurred in utero*." (§ 123467, subd. (a), italics added.)

Health and Safety Code section 123464 does not define "perinatal," but Welfare and Institutions Code section 14134.5 defines it as "the period from establishment of pregnancy to one month following delivery." (Welf. & Inst. Code, § 14134.5, subd. (b).) Elsewhere in the Health and Safety Code, the Legislature defines "perinatal care" as "care received from the time of conception through the first year after birth." (Health & Saf. Code, § 123485, subd. (d).) The International Encyclopedia of Public Health provides that the term "perinatal" is generally used to describe the period from approximately 22 completed weeks of pregnancy up to seven completed days of life. (See

21

Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2223 (2021–2022 Reg. Sess.) Apr. 5, 2022, p. 10 [citing L.S. Bakketeig, P. Bergsjø, "Perinatal Epidemiology" (2008), p. 45].)

We need not decide which of these definitions applies here. Following any of them, the plain language of the statute clearly encompasses actions or omissions during pregnancy alleged to have caused Kiera's death within hours of her birth. There is thus no question that the statute prohibits the prosecution of Carpenter for any effect that her alleged drug use or lack of prenatal care may have had on Kiera, or her decision to have a home birth (which is also separately protected because section 123467 mandates that a person may not be deprived of their right under section 123462 "to make and effectuate decisions about all matters relating to pregnancy, including . . . childbirth")—regardless of whether such acts or omissions may have contributed to Kiera's death. All of these acts fall within the plain language of the immunity established by section 123467.[3]

---

[3] At oral argument, counsel for Carpenter argued that cutting the umbilical cord is an "action[] . . . with respect to [her] pregnancy" as contemplated by section 123467 and is therefore also protected conduct under the statute. Read in isolation, we acknowledge that this is one possible interpretation of the statutory phrase "with respect to their pregnancy," which the Legislature has not further defined. We also agree with Carpenter that pregnancy and childbirth exist along a continuum. It is thus difficult to pinpoint the precise moment at which a pregnancy ends and actions can no longer be characterized as being taken "with respect to" the pregnancy. Under Carpenter's broad interpretation, however, the statute would confer immunity even if she had deliberately decided not to clamp the umbilical cord for the purpose of causing her baby to bleed to death. We do not believe the Legislature intended to create such immunity for perinatal deaths. Based on the statutory language read as a whole, we conclude that the Legislature intended to limit the immunity for perinatal deaths to "causes that occurred in utero." (§ 123467, subd. (a).) As we will further explain, any ambiguity in the statutory language is resolved by the legislative history, which indicates

The People do not dispute this conclusion as it relates to the *actus reus* of the charges filed against Carpenter. Rather, they contend that: (1) the phrase "perinatal death due to causes that occurred in utero" renders section 123467 inapplicable to this case, because it is Carpenter's acts and omissions *after* Kiera's birth, not while she was in utero, that form the basis of the charges against Carpenter, and the prosecution therefore falls outside the purview of Assembly Bill 2223; and (2) although Carpenter cannot be prosecuted for her acts or omissions during her pregnancy prior to Kiera's birth, such conduct can be used to demonstrate the necessary *mens rea*—here, implied malice.

Carpenter, on the other hand, contends that the magistrate's consideration of the evidence of her conduct during pregnancy was consistent with the People's now unlawful theory of the case: that she made a criminal error in deciding, against the advice of others, to give birth at home alone; and that decision, along with her drug use, resulted in the death of her baby. (See §§ 123462 and 123467, subd. (a).) According to Carpenter, the People have now pivoted to a new theory based on her conduct after Kiera's birth, but there is no way to extricate her conduct during pregnancy from the effect that conduct allegedly had on her pregnancy outcome. She argues that evidence of her pre-birth conduct is therefore inadmissible, because allowing the People to present such evidence to prove the intent element of her allegedly criminal post-birth conduct would undermine the legislative intent of Assembly Bill 2223.

We conclude first that sections 123462 and 123467, subdivision (a), do not prohibit the People's prosecution of Carpenter for post-birth acts or

that the Legislature passed this statute mainly with the intent of providing immunity for adverse pregnancy outcomes due to self-managed abortions or drug use during pregnancy. (See Section II.C., *post*.)

omissions that may have led to Kiera's death. Any such cause of perinatal death would necessarily not have "occurred in utero," and thus does not fall under the types of pregnancy outcomes shielded from prosecution by section 123467. (§ 123467, subd. (a).) Section 123462 protects Carpenter's right to have a home birth and make decisions regarding her childbirth, but there is no indication from the statutory language that the Legislature intended to also immunize all otherwise criminal acts or omissions occurring after a live birth.

The *evidentiary* use of Carpenter's pre-birth conduct presents a more challenging issue. Though it is a close call, we believe the People have the better argument here and conclude there is no categorical exclusion of pre-birth evidence.

First, the plain language of Assembly Bill 2223 does not prohibit the use of a person's conduct during pregnancy as evidence of implied malice or any other criminal intent if the person is not otherwise immune to prosecution. We will not infer from the statute an evidentiary rule not expressly stated. (See *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 73–74 (*Cornette*) ["A court may not rewrite a statute, either by inserting or omitting language, to make it conform to a presumed intent that is not expressed."].)

Carpenter's argument is further undermined by the fact that elsewhere in Assembly Bill 2223, the Legislature included express language similar to the rule she implicitly argues for here. The bill amended section 103005, which requires a coroner to include certain facts on a fetal death certificate, to add the following: "This section shall not be used to *establish, bring, or support a criminal prosecution* or civil cause of action seeking damages against any person who is immune from liability under Section 123467."

24

(§ 103005, subd. (b), italics added.) Thus, had the Legislature intended to enact a similar evidentiary rule relating to conduct during pregnancy, it "clearly knew" how to do so and could have explicitly so stated. (*People v. Albillar* (2010) 51 Cal.4th 47, 56; see also *Cornette, supra*, 26 Cal.4th at p. 73 ["When one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning."].)

Moreover, taking Carpenter's interpretation of the statute to its logical conclusion would lead to absurd consequences. What if, for example, a defendant made statements while pregnant that she intended to smother her baby to death once it was born and thought it would be easier to get away with the act at home than in the hospital, and then in fact did so in the hours after the baby was born? We do not believe the Legislature intended through Assembly Bill 2223 to prevent the prosecution from using such statements as evidence of intent to kill simply because they were made during pregnancy, but that would be the result compelled by Carpenter's statutory interpretation. We therefore conclude, based on the statutory language and principles of statutory construction, that the prosecution is not categorically precluded from using pre-birth conduct as evidence of Carpenter's intent.

C. *Legislative History*

Even if the statutory language were ambiguous, the legislative history of Assembly Bill 2223 further supports our conclusion that sections 123462 and 123467 do not categorically prohibit the People's prosecution of Carpenter or their reliance on her statements during pregnancy as evidence of intent in this case. There is nothing in the legislative history to indicate that the Legislature intended to immunize all post-birth conduct associated with pregnancy and home birth.

Assembly Bill 2223's findings and declarations define reproductive justice as "the human right to control our bodies, sexuality, gender, work, and reproduction," which at its core is "the belief in the right to bodily autonomy, the right to have children, the right to not have children, and the right to parent the children we have with dignity and respect in safe and sustainable communities." The bill explains that the prohibition of "civil and criminal penalties for people's actual, potential, or alleged pregnancy outcomes" is critical to making reproductive justice a reality for all Californians. Indeed, Assembly Bill 2223 was passed in part in response to criminal prosecutions across the country of people for "having miscarriages or stillbirths or for self-managing an abortion," and the bill's findings and declarations, drafted by the bill's author, note that "California has not been exempt. Despite clear law that ending or losing a pregnancy is not a crime, police have investigated and prosecutors have charged people with homicide for pregnancy losses. For example, the District Attorney in the County of Kings prosecuted two women for murder after they suffered stillbirths." Each woman was prosecuted (and imprisoned) based on the theory that her drug use during pregnancy caused the death of her fetus. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2223 (2021–2022 Reg. Sess.) May 19, 2022, p. 8.) This background provides useful context and further elucidates that one of the Legislature's main goals in passing the bill was to prohibit the criminalization of adverse pregnancy outcomes due to self-managed abortions or drug use during pregnancy.

Underscoring these points are the June 20, 2022 bill analysis comments from the Senate Rules Committee: "Even though existing state law does not criminalize a person's own actions that might result in a pregnancy loss, two women were recently charged and imprisoned for their

26

pregnancy losses in California. *In response to this*, the bill reaffirms and strengthens protections in existing state law that prohibit civil or criminal liability for the acts of a pregnant person in relation to their pregnancy outcomes." (Sen. Rules Com., 3d reading analysis of Assem. Bill 2223 (2021-2022 Reg. Sess.) as amended June 20, 2022, p. 4, italics added.) The comments additionally note that, "in response to" the United States Supreme Court's recent opinion in *Dobbs v. Jackson Women's Health* (June 24, 2022) __ U.S. __ 142 S.Ct. 2228 overturning "almost 50 years of precedent that the right to an abortion was protected under the U.S. Constitution" and a recent Texas law banning abortions beginning six weeks after a person's last menstrual period, Assembly Bill 2223 "seeks to ensure that no one in the State of California is investigated, prosecuted, or incarcerated from ending a pregnancy or experiencing a pregnancy loss and that their right to reproductive freedom is protected." (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 2223 (2021–2022 Reg. Sess.) as amended June 20, 2022, pp. 4–5.)

Moreover, comments from the analysis for the April 5, 2022 hearing of the Assembly Committee on Judiciary specifically address the People's argument that the statute does not immunize a pregnant person from prosecution for all pregnancy outcomes during the perinatal period. The phrase "due to causes that occurred in utero" in section 123467 was not initially included in the statutory language. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2223 (2021–2022 Reg. Sess.) Apr. 5, 2022, p. 9.) It was added via amendment to address concerns from opponents to the bill who argued that the "perinatal death" language could preclude criminal investigation of an infant's death regardless of the alleged cause. (*Id.* at pp. 9–10.) The bill's author noted that the statutory language as initially

27

drafted "may not be sufficiently clear that 'perinatal death' is intended to be the consequence of a pregnancy complication. Thus, the bill could be interpreted to immunize a pregnant person from all criminal penalties for all pregnancy outcomes, including the death of a newborn for any reason during the 'perinatal' period after birth, including a cause of death which is not attributable to pregnancy complications, *which clearly is not the author's intent.*" (*Id*. at p. 10, italics added.)

The author therefore proposed the following language for section 123467, subdivision (a): "Notwithstanding any other law, a person shall not be subject to civil or criminal liability or penalty . . . based on their actions or omissions with respect to their pregnancy or actual, potential, or alleged pregnancy outcome, including miscarriage, stillbirth, or abortion, or perinatal death *due to a pregnancy-related cause*." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2223 (2021–2022 Reg. Sess.) Apr. 5, 2022, p. 10.) The phrase "due to a pregnancy related cause" was ultimately revised to "due to causes that occurred in utero." (See § 123467, subd. (a).)

Seeking to avoid the obvious conclusion resulting from this legislative background, Carpenter argues that her situation exemplifies the Legislature's public health concerns and is precisely the type of scenario the Legislature sought to avoid in enacting Assembly Bill 2223: she planned a home birth because she reasonably and justifiably feared CWS would remove her children from her custody based on her substance use disorder as had happened in the past.

But her description of the legislative intent is not quite accurate. Assembly Bill 2223's declarations and findings state: "The threat of criminal prosecutions or civil penalties on pregnant people through child welfare, immigration, housing, or other legal systems has a harmful effect on

28

individual and public health.  When a person fears state action being taken against them related to their pregnancy, they are less likely to seek medical care when they need it.  If they do seek care, punishing them for actual, potential, or alleged pregnancy outcomes interferes with professional care and endangers the relationship between providers and patients."  The various committee analyses of the bill include commentary from the bill's co-sponsors noting that the "threat of criminal prosecution has a harmful effect on individual and public health, because people who fear prosecution due to their health issues are deterred from seeking care."  (See, e.g., Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2223 (2021–2022 Reg. Sess.) May 19, 2022, p. 9; Assem. Com. on Health, Analysis of Assem. Bill No. 2223 (2021–2022 Reg. Sess.) Apr. 19, 2022, p. 6.)  This indicates that the Legislature and sponsors of the bill sought to protect pregnant people from criminalization of their pregnancy outcomes, not those who avoid seeking medical care because they are afraid of having their child removed by CWS.

Indeed, the legislative comments confirm that Assembly Bill 2223 does not affect the ability of the state to consider, under already-existing child welfare laws, "a parent's dangerous acts during pregnancy because those acts could affect the welfare of a child who is born after the pregnancy. . . .  Thus, a pregnant person's actions during pregnancy *could* ultimately affect their parenting rights and result in the deprivation of those rights."  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2223 (2021–2022 Reg. Sess.) Apr. 5, 2022, p. 9.)  The bill's author proposed adding the phrase "under this article" to the original language "to clarify that the immunity provided by the bill only extends to the deprivation of rights related to pregnancy."  (*Id.* at p. 10.)  The provision as enacted therefore states that a person "*under this article, based on their actions or omissions with respect to their pregnancy or actual,*

29

potential, or alleged pregnancy outcome . . . ." (§ 123467, subd. (a), italics added.) Under the now-effective law, CWS can still remove a child from their parent's custody after they are born based on conduct that occurred during pregnancy, including drug use.

Viewed against this backdrop, it is clear that the focus of Assembly Bill 2223 was on ensuring no one in California is prosecuted or subject to civil penalties for ending a pregnancy or experiencing a pregnancy loss, including due to self-managed abortions or drug use during pregnancy. We therefore conclude that Health and Safety Code sections 123462 and 123467 do not automatically preclude prosecution of Carpenter under Penal Code sections 187 and 273a, subdivision (a), for any post-birth conduct that allegedly caused Kiera's death, nor do they preclude use of her conduct during pregnancy as evidence of intent.

Our determination on this point does not, however, compel us to also conclude that the People are not at all constrained by Health and Safety Code sections 123462 and 123467 in terms of the evidence they may rely on in this case. To the contrary, and as we explain in more detail below, some of the evidence presented at the preliminary hearing may not be admissible to demonstrate implied malice for Carpenter's post-birth conduct, because it relates to conduct now protected under Assembly Bill 2223.

## III

Having concluded that sections 123462 and 123467 do not automatically immunize Carpenter from prosecution for Kiera's death, we must now determine whether the allowable evidence presented at the preliminary hearing was sufficient to demonstrate implied malice murder such that Carpenter was properly bound over on the murder charge.

A. *Implied Malice Murder*

Murder is the unlawful killing of a person with malice aforethought. (Pen. Code, § 187, subd. (a).)  Malice aforethought can be either express or implied, with the latter defined as "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188, subd. (a)(2).)  The Supreme Court has interpreted implied malice to have "both a physical and a mental component.  The physical component is satisfied by the performance of an act, the natural consequences of which are dangerous to life." (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*), internal quotation marks omitted.)  It is also satisfied by the failure to act where the defendant has a legal obligation to act. (*People v. Werntz* (2023) 90 Cal.App.5th 1093, 1115 (*Werntz*).)  Carpenter had such an obligation here, as "parents have a common law duty to protect their children and may be held criminally liable for failing to do so." (*People v. Rolon* (2008) 160 Cal.App.4th 1206, 1219; see also *Werntz*, at p. 1116 [finding physical component of implied malice murder satisfied where mother failed to protect her daughter].)

The mental component is satisfied where the defendant knows that their " 'conduct endangers the life of another and . . . acts with a conscious disregard for life.' " (*Chun, supra*, 45 Cal.4th at p. 1181.)  The standard is subjective—the defendant must have "*actually appreciated* the risk involved." (*People v. Watson* (1981) 30 Cal.3d 290, 297 (*Watson*).)  Given that there is rarely direct evidence of subjective awareness, it often must be proved by circumstantial evidence. (See *Valenzuela, supra*, 73 Cal.App.5th at p. 502.)

Thus, to establish implied malice, the People must prove four elements: (1) Carpenter intentionally committed the act in question or intentionally failed to act; (2) the natural and probable consequences of which were

31

dangerous to human life; (3) at the time she acted or failed to act, she knew her act or failure to act was dangerous to human life; and (4) she deliberately acted or failed to act with conscious disregard for human life. (See *Chun*, *supra*, 45 Cal.4th at p. 1181; *Werntz, supra*, 90 Cal.App.5th at pp. 1115–1116.)

B. *Analysis*

Carpenter contends that the People failed to present evidence of two of the required elements of implied malice murder: (1) the mental component, or subjective knowledge of danger to life; and (2) causation. In this procedural posture, we do not determine whether there is substantial evidence satisfying these components of implied malice; rather, we must determine whether, "[c]onsidering all the evidence and reasonable inferences at this stage of the proceedings, there is 'some rational ground for assuming the *possibility*' " that there is sufficient evidence in support of these elements. (*Valenzuela*, *supra*, 73 Cal.App.5th at p. 504, italics added.) We conclude that there is.

1. *Sufficiency of the Evidence of Causation*

The People rely mainly on Carpenter's act of cutting Kiera's umbilical cord without properly securing it as well as her alleged failure to timely call 911 to support the physical component of the implied malice murder charge. Carpenter does not dispute the fact that she cut the umbilical cord or the timing of her call to 911. Instead, she argues that there is a lack of evidence showing that her action or inaction caused Kiera's death. We find that sufficient evidence was presented at the preliminary hearing to demonstrate probable cause that Carpenter's failure to properly secure the umbilical cord

and/or seek medical attention for Kiera after she continued bleeding caused her death.[4]

Dr. Park, the medical examiner who conducted Kiera's autopsy, testified at the preliminary hearing that her determination as to Kiera's cause of death was "perinatal death associated with methamphetamine and buprenorphine toxicity and unattended delivery." She stated that "unattended delivery" was "meant to describe the fact that improper procedure was performed in order -- at the time of delivery, which included not clamping the umbilical cord upon cutting the cord. In addition, no sterile procedure was used to cut the cord, and there was no medical personnel to -- present to monitor the fetus upon delivery. Typically, you have fetal monitoring during the time of delivery too. And, in essence, also to describe the hemorrhaging at the umbilical stump which was apparent at the time of the autopsy." She also testified to seeing dried blood around the umbilical stump and the baby's abdomen, that Kiera had been "wrapped in a hospital blanket" that was "soaked" in blood, and that her diaper "was also covered in blood."

Dr. Park further described her review of Tri-City Medical emergency records, including a report from one of the doctors who attempted to save

---

[4] However, we reject the People's contentions that two of the specific omissions by Carpenter that were dangerous to Kiera's life were (1) her refusal to call 911 when Kiera would not latch and (2) her decision to wait 30 minutes to call 911 after waking up to Kiera's lifeless body. First, we agree with Carpenter that a baby's inability to latch and breastfeed within hours of being born does not present an emergency dangerous to life, and Kiera's death therefore cannot be attributed to the fact that Carpenter did not call 911 when Kiera was unable to latch. Second, the People do not argue—and presented no evidence—that Kiera was still alive when Carpenter awoke. The failure to call 911 *after* the infant had already died cannot, both as a matter of law and common sense, be a cause of her death.

Kiera's life, stating that the emergency department doctor's assessment was that the baby had died due to fatal blood loss from the umbilical stump. She testified: "I would agree that, yes, the blood loss -- the acute blood loss is something very substantial and contributed to the death of the baby." We conclude that Dr. Park's testimony is sufficient to meet the " 'exceedingly low' " hurdle the prosecution needs to clear at a preliminary hearing in terms of demonstrating that blood loss from the umbilical stump caused Kiera's death. (*Abelino*, *supra*, 62 Cal.App.5th at p. 573.)

In arguing to the contrary, Carpenter points to Dr. Park's testimony and medical report stating that the baby's manner of death was "accidental," and her description of the acute blood loss as a mere "contribution" to death, rather than the cause. While true, these distinctions are not material. First, Dr. Park's determination of the manner of death as accidental is a medical, not legal, conclusion. Even if a death is accidental or unintentional, it may still have been caused by an act or omission committed with implied malice. Second, an act or a failure to act causes death "if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (*People v. Cornejo* (2016) 3 Cal.App.5th 36, 60, quoting CALCRIM No. 520; see also *People v. Jennings* (2010) 50 Cal.4th 616, 643 (*Jennings*) [an act may be considered the proximate cause of death where it was a "substantial factor" contributing to the death].)

Dr. Park testified that she believed Kiera's blood loss was "something very substantial" that contributed to the baby's death. No more is required at this stage. Thus, because there is some evidence that Carpenter either caused the blood loss by cutting the umbilical cord without clamping it or failed to stop the blood loss or call 911 as part of her legal duty to protect

34

Kiera, there is probable cause of causation. (See *Jennings*, *supra*, 50 Cal.4th at p. 643 [" '[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death.' "].)

Carpenter also argues that the only evidence at the preliminary hearing regarding the point from which Kiera had experienced hemorrhaging showed that it was at the umbilical cord's point of insertion into the placenta, not any allegedly improper cutting of the cord. This is not accurate, as Dr. Park testified that (1) the ER physician, Dr. Ma, "thought the baby had died because there was exsanguination or fatal blood loss from the umbilical stump," and (2) Dr. Park agreed with Dr. Ma that "the acute blood loss is something very substantial and contributed to the death of the baby." But even where physicians have competing views of the cause of death, and even if the defense theory is more plausible, the court may "not find an absence of probable cause simply because it finds the defense witnesses slightly more persuasive than the prosecution witnesses." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 257–258 (*Cooley*).)[5]

Moreover, Dr. Park testified that she could state with reasonable medical certainty that it was "likely that the baby could have survived" if a third party with medical training had been present at the birth. She based her opinion on the fact that someone such as a "midwife would have known how to deliver a baby properly to prevent acute blood loss and to have monitored the baby upon delivery to make sure that the cord and the placenta was delivered properly." Although Carpenter may not be prosecuted

_____

5 Although *Cooley* involved a determination of probable cause by a superior court in a sexually violent predator case rather than a preliminary hearing in a criminal case, the Supreme Court concluded that the standard of review for each is the same. (*Cooley*, *supra*, 29 Cal.4th at p. 257.)

for choosing to have a home birth without a midwife or any other medical professional present, this testimony still supports an inference that, had Carpenter called 911 after being unable to properly secure Kiera's umbilical cord, Kiera would not have experienced fatal blood loss.

We thus conclude that the People have presented evidence that is sufficient to support a finding of probable cause that Carpenter's failure to stop Kiera's blood loss—whether by cutting the umbilical cord and failing to secure the umbilical stump or by not calling for medical assistance when her baby was bleeding—caused her death. To be clear, however, the prosecution cannot rely on a theory that Kiera's death was attributable to methamphetamine and/or buprenorphine toxicity caused by Carpenter's drug use during pregnancy.

2. *Sufficiency of the Evidence of Subjective Knowledge*

Carpenter also contends that the People failed to present evidence that she had the subjective awareness of danger to life necessary to show that she acted with implied malice. The People argue that Carpenter's awareness of the risk to Kiera's life is evidenced by: (1) her text messages to and from people before Kiera was born, with multiple people warning her of the dangers of having a baby at home alone; (2) her text messages warning others not to call 911; (3) her attempt to stop Kiera's bleeding by placing a piece of tape on the umbilical stump; (4) her statement to Detective Malone that at one point, she started giving Kiera CPR, but it was not working; and (5) an article she printed warning of the dangers of having a home birth and containing instructions not to cut the baby's umbilical cord. They further point to evidence presented at the hearing that after Kiera was born, she turned blue and was having trouble breathing, was bleeding from her umbilical stump, had a pool of blood in her diaper, had blood on her clothing,

and became limp—all of which are visible signs of a medical emergency. According to the People, these facts demonstrate that Carpenter knew Kiera was having a medical emergency, but she willfully failed to seek medical assistance.

Although we have concluded there is no categorical preclusion of pre-birth evidence, some of the pre-birth evidence relied on by the People still raises delicate evidentiary issues because it relates directly to Carpenter's protected conduct. For example, any statements from Carpenter's friends and family expressing their opinions, *before* Kiera's birth, that merely having a home birth is dangerous go directly to Carpenter's protected conduct in choosing to have an unattended home birth. These statements are less directly relevant (if at all) to the question of Carpenter's subjective awareness of the specific danger to Kiera's life *after* she was born. And even if relevant, the admission of this evidence at trial could create a risk of conviction on the prohibited theory that Carpenter chose to give birth at home with knowledge of the risks, raising a potential admissibility issue under Evidence Code section 352. Many of Carpenter's own pre-birth text messages raise similar evidentiary issues because they also go to her mental state with respect to her protected decision to give birth at home on her own. We do not decide these evidentiary questions, however, because we do not need to rely on any of this evidence to resolve the probable cause question before us.

We conclude that the evidence of Carpenter's statements about what happened *after* Kiera was born constitutes probable cause in support of the subjective knowledge element of the implied malice murder charge. Carpenter told Officer O'Neill that after she gave birth, "the baby was not breathing, [and] possibly had a nasal passage blockage." She told Detective Malone that "[t]he baby was crying, and she cut the umbilical cord using

37

medical scissors and put some cloth over the end of the umbilical cord and tried to start nursing the baby. And at that point, the baby seemed like she was having trouble breathing and started turning blue, so she started giving the baby CPR but it wasn't working."

Carpenter argues in a footnote that we should ignore Detective Malone's testimony on this point because it is contrary to other evidence presented at the hearing, though she claims not to be asking us to reweigh the evidence to make a credibility determination. She attempts to thread the needle between the two by contending that because the magistrate did not rely on this portion of the record, we may not do so either. She is incorrect. As we have explained, the magistrate made a legal conclusion regarding the sufficiency of the evidence, and we are therefore required to conduct an independent review of the entire record to determine whether the prosecution presented evidence demonstrating probable cause. (*Valenzuela*, *supra*, 73 Cal.App.5th at p. 499.)

In conducting that review, we conclude that the testimony from Detective Malone and Officer O'Neill about Carpenter's statements is sufficient to demonstrate her subjective awareness of the danger to life for purposes of the preliminary hearing. A baby that is struggling to breathe and turning blue is clearly in distress and in need of medical attention, and Carpenter's awareness of this fact is further demonstrated by her attempt to administer CPR to Kiera.[6] Carpenter argues that the People improperly rely

---

[6] Although Carpenter also told law enforcement that she could not call 911 because her phone was dead, it is unclear whether she meant that her phone was dead when she woke up on November 15, or it was already dead right after she gave birth when Kiera was "not breathing," she was "turning blue," and the CPR "wasn't working," and Carpenter passed out before she was able to charge her phone enough to dial 911. However, at a probable cause hearing, "[e]very legitimate inference that may be drawn from the

38

on the reasonable person standard instead of Carpenter's own subjective awareness, as required to show implied malice. But under these circumstances, "[i]t takes no leap of logic . . . to conclude that because anyone would be aware of the risk, [Carpenter] was aware of the risk." (*People v. Moore* (2010) 187 Cal.App.4th 937, 941 (*Moore*) [concluding that record contained substantial evidence that the defendant acted with implied malice].)

Though a closer call, we conclude that Carpenter's subjective awareness of the danger to Kiera's life can also be inferred from the fact that the infant was bleeding from her umbilical stump after Carpenter cut the cord. Carpenter did not expressly state that she was aware Kiera was bleeding, but that fact can be inferred from the blood that was on the piece of tape she applied to the umbilical stump, which had pooled in the infant's diaper and seeped onto her blanket. Dr. Park testified that the only place on Kiera's body the blood could have come from was where her umbilical cord had been cut. If an hours-old, prematurely born infant continues to bleed from her umbilical stump despite attempts to stop that bleeding, one can infer that any parent would be aware that the situation presented a medical emergency. (See *Moore*, *supra*, 187 Cal.App.4th at p. 941.)

We recognize that there is more than one reasonable interpretation of the evidence presented at the hearing regarding Kiera's blood loss. It is possible, for example, that there was very little bleeding until after Carpenter passed out, so she did not actually witness an amount of bleeding that would lead her to believe Kiera was experiencing a medical emergency. Or, as Dr. Park admitted, it would be reasonable to think that Carpenter, who had

evidence must be drawn in favor of the information." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 (*Rideout*).) We must therefore infer that Carpenter could have called 911 but did not do so.

been bleeding profusely herself after giving birth, had transferred some of her own blood to Kiera's diaper before putting it on the infant. Again, however, we must draw every legitimate inference that can be drawn from the evidence in favor of the prosecution. (*Rideout*, *supra*, 67 Cal.2d at p. 474.) The question at this point is not whether the prosecution's evidence will support a conviction, or even whether it is persuasive, but whether it demonstrates probable cause. (See *id.* at p. 475.)

The People also contend that the article found at Carpenter's home containing instructions on what to do in an emergency home birth, including a warning not to cut the umbilical cord, further demonstrates her subjective awareness that cutting the cord presented a danger to human life. Carpenter argues that the inference the People seek to draw from the presence of this article in her apartment is purely speculative, pointing to the fact that the prosecutor herself admitted at the preliminary hearing that, "of course I have no idea and I cannot speculate whether or not she actually read [the article.]" But other evidence presented at the hearing supports the inference that Carpenter read the article.

For example, Carpenter told Shannon that she had previously read online about "the percentages of the bad things happening during home births"; she told Ken that she had been "studying" for months in preparation for a home birth; and she appears to have tabbed or highlighted other reading materials related to parenting that were found at her apartment. At this stage, such facts are sufficient to draw the inference that Carpenter also read the article, which she appears to have printed from a website, warning not to cut the umbilical cord before seeking medical assistance. There is thus " 'some rational ground for assuming the possibility' " that there will be

40

sufficient evidence at trial showing her subjective awareness of the risk to Kiera's life.  (See *Valenzuela*, *supra*, 73 Cal.App.5th at p. 504.)

We agree with Carpenter that the situations in *People v. Burden* (1977) 72 Cal.App.3d 603 (*Burden*) and *People v. Latham* (2012) 203 Cal.App.4th 319 (*Latham*), which the People analogize to this case, are easily distinguishable from the facts presented here.  The father in *Burden* allowed his five-month-old son to slowly die of starvation and admitted that he did not feed the child or do anything to help him because he " 'just didn't care' " if his son lived or died.  (*Burden*, at p. 609.)  This, along with photographs showing that the infant was obviously "in a state of terminal starvation" when he died, was sufficient to support a finding of implied malice.  (*Id*. at p. 620.)  In *Latham*, a diabetic 17-year-old died of diabetic ketoacidosis after her parents allowed her condition to deteriorate over the course of five days without seeking medical treatment.  (*Latham*, at p. 323.)  The court found that there was substantial evidence to support the parents' conviction for implied malice murder because the girl had been hospitalized in the past, the parents had received training to recognize the symptoms of diabetic ketoacidosis, multiple people who saw the girl in the days leading up to her death told her parents she needed to go to the hospital, and testimony indicated that the parents did not seem to care about their daughter's condition.  (*Id*. at pp. 328–331.)

Carpenter's actions, or alleged lack thereof, do not come close to showing the same "lack of concern as to the victim's survival" that was present in *Burden* and *Latham*, as the People argue.  The conduct of a father who watches his five-month-old infant slowly starve to death over the course of several weeks—or of parents who watch their diabetic 17-year-old daughter slip into a coma over the course of five days—is fundamentally

41

different from a mother who has just endured the pain and trauma of going through childbirth prematurely and alone, yet still attempts to bathe, feed, and clothe her newborn before apparently passing out due to sheer exhaustion and blood loss.

Nevertheless, the court "may not substitute its own personal belief as to the ultimate determination to be made at trial for that of a reasonable person evaluating the evidence." (*Cooley*, *supra*, 29 Cal.4th at p. 258.) Unless the prosecution has presented evidence that is "inherently implausible," its witnesses were "conclusively impeached," or "no reasonable person would find [the witnesses] credible," we may not reject its evidence at this stage. (*Ibid*.) We are not presented with such a situation here, and we therefore accept the prosecution's evidence as sufficient to show probable cause of Carpenter's subjective awareness.

IV

The same facts that support our conclusion that the prosecution has presented evidence of implied malice murder sufficient to show probable cause support the same conclusion as to the charge of felony child endangerment under Penal Code section 273a, subdivision (a). This statute applies to a person who "under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered . . . ." (Pen. Code, § 273a, subd. (a).)

For the same reasons we have already explained, we reject the People's assertion that Carpenter caused or permitted her infant to suffer

42

unjustifiable physical pain by being unable to successfully breastfeed her within hours of her birth and by texting others before calling 911 after she awoke to her lifeless baby. However, the People have presented evidence that Carpenter cut the baby's umbilical cord without properly securing the stump, allowed it to continue bleeding, saw that Kiera was struggling to breathe and that CPR was not working, and failed to call 911. The evidence presented provides "some rational ground for assuming the possibility" that these acts and omissions by Carpenter were taken willfully under circumstances likely to result in death or injury or endanger Kiera's health—and did, in fact, result in Kiera's death. (See *San Nicolas*, *supra*, 34 Cal.4th at p. 654.) We therefore find that the People have made the exceedingly low showing required to defeat the section 995 motion as to the felony child endangerment charge.

V

Carpenter also contends that construing Penal Code sections 187 and 273a to permit prosecution of this case renders those statutes unconstitutionally vague and a violation of her federal due process rights as well as her right to privacy and equal protection under the California constitution.

Her first argument is that Penal Code sections 187 and 273a fail to provide notice to a pregnant person of what conduct constitutes murder or felony child endangerment if they choose to have an unattended home birth and the outcome "is ultimately not positive." The United States Supreme Court has explained that laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" because, among other reasons, "[v]ague laws may trap the innocent by not providing fair warning." (*Grayned v. City of Rockford* (1972)

43

408 U.S. 104, 108.) We agree with the People that a person of ordinary intelligence would know that intentionally failing to call 911 when their infant is struggling to breathe and bleeding after their umbilical stump has been cut without being properly secured is an abdication of parental duty that could result in criminal penalty. To the extent the People are able to prove the set of facts they allege based on Carpenter's acts and omissions after Kiera was born, we conclude that the application of the statutes is not impermissibly vague.

Carpenter next argues that prosecution of this case violates her rights to privacy and equal protection under Article I, section 1.1 of the California Constitution, which is titled "Reproductive Freedom" and provides: "The state shall not deny or interfere with an individual's reproductive freedom in their most intimate decisions, which includes their fundamental right to choose to have an abortion and their fundamental right to choose or refuse contraceptives. This section is intended to further the constitutional right to privacy guaranteed by Section 1, and the constitutional right to not be denied equal protection guaranteed by Section 7. Nothing herein narrows or limits the right to privacy or equal protection." According to Carpenter, the People are prosecuting her for choosing to have a home birth, which is a right protected under California law.

The People, on the other hand, claim to "fully recognize and honor the rights clarified and strengthened in Health and Safety Code sections 123462 and 123467" and contend that Carpenter is not being prosecuted for her choice to have a home birth. Rather, she is being prosecuted for the acts and omissions that jeopardized Kiera's life after she was born and then experienced a medical emergency.

44

We again agree with the People. Carpenter's argument on this point fails for the same reasons set forth in Section II, *ante*. California law protects Carpenter from interference with her reproductive freedom, including her right to have a home birth and make other decisions about her childbirth, but this does not mean the state also immunizes all post-birth acts and omissions related to those decisions that would otherwise be subject to criminal or civil penalty. We thus conclude that prosecution of this case does not violate Carpenter's constitutional rights.

## VI

We agree with Carpenter that she is not "similar to a parent who gives birth and abandons her baby in a dumpster," an analogy made by the People which she fairly describes as unfounded, inflammatory, and unhelpful. But this is also not a case where the baby's death is attributable solely to causes that occurred in utero, which would render the prosecution prohibited under section 123467. Regardless of the difference in the People's characterization of their argument at the time of the preliminary hearing and now on appeal, there was evidence presented at the hearing of Carpenter's conduct after her daughter's birth sufficient to find probable cause to bind her over on the charges filed against her under current law.

We find the Supreme Court's words in *Watson* fitting here: "We do not suggest that the foregoing facts conclusively demonstrate implied malice, or that the evidence necessarily is sufficient to convict defendant of second degree murder. On the contrary, it may be difficult for the prosecution to carry its burden of establishing implied malice to the moral certainty necessary for a conviction. Moreover, we neither contemplate nor encourage the routine charging of second degree murder in [these types of] cases. We merely determine that the evidence before us is sufficient to uphold the

45

second degree murder counts in the information, and to permit the prosecution to prove, if it can, the elements of second degree murder." (*Watson*, *supra*, 30 Cal.3d at p. 301.)  Nothing more is required to survive a Penal Code section 995 challenge, and we therefore deny Carpenter's petition at this early stage of the proceedings.

DISPOSITION

The petition is denied.  The stay issued by this court on March 14, 2023, is vacated.

BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.